**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **DIANE SINGLETON** | **PLAINTIFF** |
| vs. | **CIVIL ACTION No.: 3:22-CV-34-HTW-LGI** |
| **MADISON COUNTY;** | |
| **MADISON COUNTY CITIZEN SERVICES AGENCY; and** | |
| **CARLOS HENDERSON** | **DEFENDANTS** |

**ORDER**

**BEFORE THIS COURT** is ECF No. 60, a Motion for Summary Judgment by Defendant Madison County ("MC"). Plaintiff Diane Singleton ("Singleton") opposes. Defendant Madison County Citizen Services Agency ("MCCSA") has not opposed, nor conceded, and Defendant Carlos Henderson ("Henderson") has not appeared.

### I. BACKGROUND

Early 2020, Singleton suffered gunshot wounds (supposedly caused by Henderson, who was later charged and convicted) and Singleton thereafter was confined to a wheelchair. Singleton availed herself of public transportation services. In 2020, an MCCSA driver was taking Singleton to a medical appointment when she was ejected from her wheelchair and broke a leg. Alleging that the driver had caused her injuries by improperly loading and securing Singleton in the vehicle and driving the vehicle too quickly over speed bumps, Singleton filed suit. Singleton sues both MC and MCCSA for violations of the Mississippi Torts Claims Act ("MTCA"), the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Rehabilitation Act (29 U.S.C. § 701), and the Americans with Disabilities Act (29 U.S.C. § 12101 *et seq.*). Singleton also sues Henderson for gross negligence.

MC, in lieu of answering Singleton's Complaint, filed a motion to dismiss all of Singleton's claims against it for want of subject-matter jurisdiction and for failure to state a claim upon which

relief could be granted. ECF No. 19. This Court entered an order, finding that it had subject-matter jurisdiction over the suit, with federal question jurisdiction over the federal claims and supplemental jurisdiction over the MTCA claim. ECF No. 54 at 2 (which order is incorporated herein). This Court found that MC's motions for dismissal for failure to state a claim on which relief could be granted should be converted into a motion for summary judgment because MC supported its motion with evidentiary attachments. *Id.* at 4 (citing Fed. R. Civ. P. 12(d)). This Court then denied without prejudice these motions. *See id.* at 13.

With respect to one of MC's arguments—that it was not a proper defendant because of its separation from the operations of MCCSA—this Court granted Singleton leave to conduct limited discovery on the establishment of MCCSA and the relationship between MC and MCCSA. ECF No. 54 at 13. After months of discovery, MC reraised its argument, filing for summary judgment on the basis that MC "is a wholly separate government entity from" MCCSA such that it "cannot be held liable for the alleged acts or omissions of" MCCSA. ECF No. 61 at 1.

## II. STANDARD OF REVIEW

This Court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court's job, at this stage, is not "to weigh the evidence and determine the truth of the matter[,] but to determine whether there is a genuine issue for trial." *Id.* at 249. A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record which "demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies the standard for summary judgment, the nonmoving party must then "go beyond the pleadings" and to affidavits, or into the record, to designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. This Court views "the evidence in the light most favorable to the nonmoving party." *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 697 (5th Cir. 2024).

### III. DISCUSSION

The gravamen of MC's motion is that MC is not a proper party. MC contends that MCCSA, not MC, should bear Singleton's ire, as it was an MCCSA vehicle and driver who supposedly caused her accident. Meanwhile, MC adds that it does not control the day-to-day operations or set safety or other policies for the MCCSA—and, generally, is unconnected to this suit.

Under the MTCA, the State of Mississippi and its "political subdivisions"[1] are "immune from suit at law or in equity on account of any wrongful or tortious act or omission." Miss. Code Ann. § 11-46-3. That immunity is waived, though, in "claims for money damages arising out of the torts of such governmental entities and the torts of their employees[2] while acting within the

---

[1] According to the statute:

> "Political subdivision" means any body politic or body corporate other than the state responsible for governmental activities only in geographic areas smaller than that of the state, including, but not limited to, any county, … or other instrumentality of the state, whether or not the body or instrumentality has the authority to levy taxes or to sue or be sued in its own name.

§ 11-46-1(i) (some portions omitted).

[2] The statute also specifies:

> "Employee" means any officer, employee or servant of the State of Mississippi or a political subdivision of the state, including elected or appointed officials and persons acting on behalf of the state or a political subdivision in any official capacity, temporarily or

course and scope of their employment" (subject to some caveats). § 11-46-5. MC argues that MCCSA is the supposed tortfeasor, and that MC, a separate political subdivision, cannot be held liable for MCCSA's acts or omissions under the MTCA.

According to MC, MC's supposed status as a separate political subdivision under Mississippi law also means that Singleton cannot sue MC for MCCSA's wrongs under *federal* causes of action—because Rule 17(b)(3) of the Federal Rules of Civil Procedure compels district courts to apply *state* law to determine a public entity's "[c]apacity to … be sued." MC argues that relevant Section 1983 and ADA/Rehabilitation Act precedent precludes suit against MC because MC and MCCSA, as parties, are distinct from one another. ECF No. 61 at 12–14.[3]

Singleton does not quarrel with MC's legal framing of the necessary predicates to liability; rather, she mounts a factual challenge. Singleton offers evidence supposedly showing a "dispute of material fact on whether [MC] and MCCSA are two separate entities." ECF No. 63 at 12.

Both parties hitch their wagon to the case of *Brown v. Thompson*. 927 So. 2d 733 (Miss. 2006). There, the Mississippi Supreme Court held that a defendant sheriff's department did "not enjoy a separate legal existence, apart from [the county], and the case was properly dismissed for failure to name a political subdivision defendant" under the MTCA. *Id.* at 737. The Mississippi Supreme Court, to so hold, reviewed the "structural relationship between counties and sheriff's

---

permanently, in the service of the state or a political subdivision whether with or without compensation, ….

§ 11-46-1(f) (some portions omitted).

[3] (citing, e.g, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983."); *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 431 (5th Cir. 1997) ("To allege an ADA violation, though, the plaintiffs must also maintain, among other things, that they are being denied the benefit of a service *for which* the Secretary *is responsible*." (emphasis added))).

departments." *Id.* The Mississippi Supreme Court found especially important that, pursuant to statute, the county has authority to examine the sheriff's department's proposed budget and to "*increase or reduce said amount as it deems necessary and proper.*" *Id.* (quoting Miss. Code Ann. § 19-25-13 (Rev. 2003) (emphasis added by the Mississippi Supreme Court). The Mississippi Supreme Court reasoned that the "money flows from the county, which would suggest that judgments against the sheriff or deputies are ultimately paid out of the county treasury." *Id.* Although the sheriff could hire and fire deputies, his decisions on their pay was "subject to the budget for the sheriff's office approved by the county board of supervisors." *Id.* at 737–38 (quoting § 19-25-19). The Mississippi Supreme Court held that the "proper governmental entity to name as defendant in this suit" was the county, not its sheriff's department. *Id.* at 738.

In *Barnes ex rel. Herring v. City of Canton*, a panel of the Court of Appeals of Mississippi found that a bureau was properly dismissed under the MTCA as "a political subdivision, … created by the Legislature to ... promot[e] tourism." 207 So. 3d 1272, 1275 (Miss. Ct. App. 2016). The panel distinguished the bureau from the sheriff's department in *Brown* on the bases that the bureau was funded by a tax, deposited into an account separate from the city's general fund, and that the bureau had various, financial, statutory powers of its own.

With this legal framing in mind, this Court examines the record to determine whether MC is a separate legal entity from MCCSA, and, therefore, an improper party to this suit.

**A. MC's Initial Showing**

1. <u>Statutory Scheme</u>

Mississippi statute "empower[s]" the boards of supervisors for Mississippi counties—and certain other local entities—to "create human resource agencies" which "shall be operated under local governmental control and shall be responsible for [the] administration of programs heretofore

conducted by community action agencies,[4] limited purpose agencies and related programs authorized by federal law." Miss. Code Ann. § 17-15-1. Said board of supervisors appoints the "governing board for each human resource agency so created." § 17-15-3.

Under statute, the governing board's powers include:

> the power to adopt bylaws, to appoint persons to senior staff positions including the appointment of an executive director, to determine major personnel, physical and program policy and approve overall program plans and priorities and to assure compliance with conditions of and approve proposals for financial assistance over this chapter.

Miss. Code Ann. § 17-15-5. Said "executive director shall hold office at the will and pleasure of the governing board," and the board fixes his or her salary. *Id.* To "carry out its overall responsibility for administering a human resource program," the human resource agency has:

> the authority to own and dispose of property, both real and personal, and to receive and administer funds under this chapter, funds and contributions from private or local public sources which may be used in support of a human resource program, and funds under any federal or state assistance program pursuant to which such an agency organized in accordance with the provisions of this chapter could serve as grantee, contractor, or sponsor of projects appropriate for inclusion in a human resource program.

§ 17-15-7. The Mississippi Attorney General ("Miss. AG") has reasoned that "nothing in [this statute] suggests the county board of supervisors can operate the agency except in the form of general fund appropriation" and that the statute delegates "[d]ay to day operations, budgeting, and expenditures of the agency … to the agency governing board, not the county board of supervisors." ECF No. 32-1 (1992 WL 614231 (Miss. A.G.)) (opining that a board of supervisors which helped

---

[4] Such "community action" or "human resource agencies" tout their themselves as having "the mission of enabling low-income Mississippians to rebuild their lives, nurture their families, revitalize their communities and become self-sufficient." *Who We Are*, MISS. ASS'N CMTY. ACTION AGENCIES (last accessed Mar. 10, 2025), https://msacaa.org/about/who-we-are/.

create a human resource agency is not liable for the agency's deficit spending); ECF No. 32-2 (1989 WL 503417 (Miss. A.G.)) at 2–3.

Each year, the governing board must "prepare an annual audit report of its activities" and submit a copy thereof to the boards of supervisors" and its "financial records … shall be subject to audit by said boards of supervisors[.]" Miss. Code Ann. § 17-15-9.  The board of supervisors "may, in [its] discretion, set aside, appropriate and expend funds from the general fund or federal revenue sharing funds to defray the administrative expenses incurred in the operation of such human resource agency."  § 17-15-11.  While the human resource agency's "activity must necessarily be subject to the funds which have been lawfully budgeted for operation of the agency," the Miss. AG has reiterated that "day to day activities" must remain under the direction of the agency's governing board and executive director.  ECF No. 32-2 (1989 WL 503417 (Miss. A.G.)) at 3.

Whether a human resource agency, established under Section 17-15-1 et seq. of the Mississippi Code, is a separate entity from the county or other local entity that establishes it apparently is an issue of first impression.  Against the backdrop of *Brown* and *Barnes* (see supra), as well as the Miss. AG's advisory opinions, however, this Court sees it highly probable that the Mississippi Supreme Court would determine that such a human resource agency "enjoy[s] a separate legal existence" from the establishing entity.  While such an agency must submit to audit and may receive discretionary appropriations from its establishing entity, the statutory scheme permits the agency to act independently, own and dispose of its own property, collect funds apart from county appropriations, and set its own policies.  Unlike in *Brown*, nothing indicates that MC, the establishing entity, may "increase or reduce" the human resource agency's budget.

This Court now turns to the specifics of MCCSA and its relationship with MC to determine whether, in fact, a genuine dispute exists as to whether one cannot be separated from the other.

2. <u>MCCSA's Establishment and Status</u>

MC, in its interrogatory responses, explains that, in 2006, the MC Board of Supervisors ("BOS") "voted to establish a new human resource agency," namely MCCSA, "consistent with Miss. Code Ann. § 17-15-1." ECF No. 60-1 at 1–2. MC recounts that the BOS concurrently "appointed the first five members of the MCCSA's board, consistent with Miss. Code Ann. § 17-15-3." *Id.* MCCSA, in its own responses, notes that MC "paid for," and "provided some legal work" in connection with, the formation of MCCSA. ECF No. 60-2 at 1. MCCSA's manual likewise states that MCCSA "was established in 2007 as the human services agency of the" BOS. ECF No.63-1.

MC also claims to be a "separate statutory government entity from" MCCSA, and states it does not "establish MCCSA policies or procedures," "conduct the MCCSA's hiring[,] or otherwise give the MCCSA direction." ECF No. 60-1 at 5. MC claims "no involvement with the day-to-day operations of the MCCSA." *Id.* at 6. MCCSA, in its responses, concurs. *See* ECF No. 60-2 at 3 (including by explaining that MC "does not oversee the operations of MCCSA").

Based on this evidence, backed up by Mississippi's statutory scheme and the opinions of the Miss. AG, this Court finds that MC has met its initial responsibility to show that summary judgment is warranted based on MC's and MCCSA's existence as separate political subdivisions. This Court, then, moves on to the various points that Singleton raises in attempt to establish a genuine issue of material fact.

B. **Singleton's Response**

1. <u>Financial Allocations, Auditing, and Federal Funding Requests</u>

Singleton contends that MC's funding of MCCSA evidences MC's control over MCCSA. Indeed, the Comptroller of the MC BOS stated that the BOS allocated $609,500.00 in its annual budget to MCCSA "to assist it in carrying out its operations." ECF No 19-2 (Decl. of Na'Son White). The Comptroller cautioned, though, that applications of "these funds are at the authority, direction and discretion" of MCCSA and "MC BOS does not direct MCCSA in the use of these funds." *Id.* MC, in its interrogatory responses, avers that, consistent with Section 17-15-11, "it provides, at its discretion, about 20% of MCCSA's overall budget, but does not "'allocate' or otherwise control the MCCSA's budget." *Id.* at 5. MCCSA also confirms that MC does not approve MCCSA's budget and that MCCSA receives funds from sources other than MC. ECF No. 60-2 (MCCSA interrogatory responses) at 3; *see also* ECF no. 63-1 (MCCSA employee manual) at 4 (explaining that MCCSA is funded by "federal, state, and local resources.").

MC admits that MCCSA, pursuant to Section 17-15-9, conducts an internal financial audit and submits a report to the MC BOS each year. ECF No. 60-1 (MC's interrogatory responses) at 8–9. MC, however, denies that MC "oversee[s]," "audit[s,] or inspect[s]" MCCSA's operations. *Id.*; *see also* ECF No. 60-2 (MCCSA's interrogatory responses) at 2 (MCCSA "is not aware of any audits or inspections conducted by" MC of MCCSA).

Singleton submits the 2019 meeting minutes of MC BOS, which record that the BOS approved MCCSA's "Notice of Intent to apply for funding for General Public Transportation Services through MDOT and [a]uthorize[d] the Board President to execute same." ECF No. 23-5 at 5. Singleton also submits a copy of a "Notification of Intent to Apply for Federal Assistance … to Provide Transportation Services[.]" ECF No. 63-1 at 95. The MC BOS President signed it, indicating that he had "the opportunity to review the transportation service proposal of" MCCSA,

and "believe[d] that this type of service [was] needed at th[at] time." *Id.* Singleton argues that this document shows that MC "approved MCCSA's intent to seek funding." ECF No. 63 at 12. MC though, clarifies that MCCSA is required by law to notify MC when it intends to apply for federal transportation grants, but that MCCSA does not need MC's "approval." ECF No. 60-1 at 8. Such "executions simply constitute [MC's] acknowledgement that it received such notifications from the MCCSA and that the [MC's] citizens have a need for such funds." *Id.*

This Court finds that MC's discretionary provision of funds, acceptance of MCCSA's internal audit, and review and signing of MCCSA's intent to pursue federal funding insufficient to establish a genuine issue of material fact to contest the separateness of MC and MCCSA. Although MC may provide some of MCCSA's budget, this situation is distinct from the one presented in *Brown*, where the county board of supervisors, by statute, had control over the Sheriff's budget and where "the money flow[ed] from the county." 927 So. 2d at 737–38.

2. Provision of Assets, Office Space, and Legal Advice

Singleton highlights that MC BOS, in 2006, "authorized and directed" a newspaper advertisement for the position of Executive Director of the MCCSA. ECF No. 23-3 (MC BOS meeting minutes) at 5. MC admits its BOS approved the County Administrator to help advertise for the position of Executive Director for the MCCSA but explains that it "did not hire" this Executive Director. ECF No. 60-1 (interrogatory responses) at 2. MC argues that "it has no authority to hire MCCSA staff or determine personnel policy. *Id.* at 3. MCCSA, via interrogatory response, concurs that its board would have hired the Executive Director. ECF No. 60-2 at 2.

Singleton argues that MC is responsible for MCCSA because MC "assigns vehicles to MCCSA." ECF No. 63 at 12. Specifically, Singleton refers this Court to MC BOS meeting minutes of the MC from 2007, wherein the MC BOS "assign[ed]" a 2001 Chevrolet Impala to MCCSA. ECF No. 23-2 at 2. Asked to describe any assets provided for MCCSA's creation, MC

identifies this putative assignment. ECF No. 60-1 at 3. Singleton provides no records of any other vehicle assignments from MC to MCCSA.[5] Singleton also does not contend that this 2001 Impala was the vehicle in which Singleton suffered the injuries underlying this suit.

Singleton argues that MC's "attorney prepared a lease for MCCSA," based on MC BOS meeting minutes from 2017. ECF No. 63 at 12. The minutes, however, do not reflect the characterization sought by Singleton. Therein, the MC BOS "direct[ed] [the BOS Attorney] to prepare a lease agreement … to lease the rear area of the Madison County Citizens Service building located on the Canton square … and declare same as surplus property." ECF No. 23-4 at 6. MC explains that the property belonged to MC for administrative offices, and MC merely "allowed" MCCSA to use that space prior to leasing it to another entity. ECF No. 60-1 (MC's interrogatory responses) at 4, 10; *see also* ECF No. 60-2 (MCCSA's interrogatory responses) at 2–3 (noting that MC provided MCCSA office space in one of its buildings).

Singleton asked about the relationship between the County Attorney and MCCSA in discovery. "[F]rom time-to-time," responded MC, the County Attorney "answers legal questions posited by the MCCSA's Executive Director, as he does for any other separate government entity that provides services for residents of" MC. ECF No. 60-1 at 10.

This Court finds that MC's limited provision of assistance to MCCSA (by assigning MCCSA a vehicle and helping to advertise an opening for its Executive Director upon MCCSA's formation; permitting MCCSA to utilize office space owned by MC; and providing MCCSA some legal assistance upon request), taken together, do not create a fact issue as to the unity of these

---

[5] Singleton provides some documents from MCCSA's document production regarding a ***2009*** Impala, but the documents show that MCCSA purchased this vehicle from a dealer. ECF No. 63-1 at 96–99 (Production No. MMCSA 0151–54).

entities—let alone that MC controls or influences MCCSA enough to be liable for torts like those here.

      3.   <u>Employee Manual, Training, and Policies</u>

Singleton also submitted the MCCSA "Employee Personnel Handbook." ECF No. 63-1 at 1–53. Singleton argues that MC's "control over MCCSA is evidenced by the [BOS] emblem being on its cover." ECF No. 63 at 5. Singleton also points out that MCCSA "follows" or "adheres to" or "observes" or "complies with" or "must abide by" various policies from MC's employee manual (including MC's vacation accrual policy, sick leave policy, holiday schedule, dress code policy, cell phone policy, etc.). *Id.* at 4–11. Singleton characterizes this as establishing that MC "provided MCCSA with its Employee Personnel Handbook and its Handbook." *Id.* at 12. Singleton claims that MC "knew or should have known that MCCSA was following" these various policies, and argues that "[t]he fact that MCCSA complies with so many of [MC's] policies creates a dispute of material fact that [MC] and MCCSA are not two separate entities." *Id.* at 13. This Court disagrees.

First, while the manual's front cover indeed is emblazoned with the MC BOS seal, the same front cover also states the manual was "[a]pproved" by the MCCSA Board of Directors. ECF No. 63-1 at 1. The manual certainly contains many references to MC employee policies, and some of these references do include language about MC or its BOS having authority over employees' leave; but typically the manual is actually just block-quoting or explaining the MC policy that the MCCSA is "referenc[ing]," "observ[ing]," "comply[ing] with," or directing its employees to "abide by." *See, e.g.*, ECF No. 63-1 at 6, 8, 15, 22. MCCSA, in some sections, includes its own original language for policies. For instance, the manual adopts MC's list of "Prohibited Conduct," before listing some additional examples of "grounds for disciplinary action." *Id.* at 16–18.

The manual also includes language inconsistent with Singleton's theory that MC controls MCCSA. For example, the manual provides that "[a]ny and all transportation contracts and agreements shall be initiated and negotiated by" MCCSA directors. *Id.* at 19; *see also cf.* ECF No. 32-2 (1989 WL 503417 (Miss. A.G.)) at 2–3 (the Miss. AG opining that human resource agencies have the statutory power to "enter into the contracts appropriate for carrying out its responsibilities"). The manual sets forth policies regarding supervision and evaluation of employees and their training and professional development. For the latter, the manual references "the Agency's in-service training program," with a component involving "quality assurance standards for programs." ECF No. 63-1 at 21. The manual references "Agency Transportation Equipment," including "MCCSA Property (buses and vans)," and then, once again, quotes MC policy on "Use of County Property." ECF No. 63-1 at 28. The manual dictates where such buses and vans may be stored and specifies some technology to be equipped therein.

The evidence shows, to the extent that the MCCSA manual bears MC's seal and follows some of its policies, MCCSA does so of its own accord—that is, MCCSA chose to adopt these policies, rather than MC providing or forcing the policies upon MCCSA. The manual cautions that nothing within its pages is "intended to limit MCCSA's exclusive authority to determine the appropriate corrective action for a given situation or intended to alter MCCSA's or an employee's right to end the employment relationship at will[,] with or without cause or notice." ECF No. 63-1 at 4. The Executive Director is "responsible for terminations of employment." *Id.* at 16.

MCCSA avers that MC "is not responsible for establishing any policies for MCCSA." ECF No. 60-2 (MCCSA's interrogatory responses) at 3; *see also* ECF No. 60-1 (MC's responses) at 5. MC's Director of the Human Resources Department stated that the employee handbook of the MC Board of Supervisors ("BOS") "does not govern or regulate the activities of" MCCSA, which "has

its own employee handbook in which MCCSA chooses [in] some instances to adopt MC BOS policies and in some instances to adopt its own policies." ECF No. 19-1 (Decl. of Loretta Phillips). She also stated that she does not train MCCSA employees "concerning personnel policies." *Id.* She opined, "[f]rom the perspective of HR," that MCCSA employees are not "considered or treated as county employees, or [as] employees of the MC BOS." *Id.* The Comptroller of the MC BOS, likewise, stated that MCCSA employees are not "on the county payroll," and that "no buses or any vehicles … owned or operated by the MCCSA" are on "the inventory list containing all vehicles owned by" MC. ECF No. 19-2 (Decl. of Na'Son White).

The mere fact that MCCSA picks and chooses some MC policies on which to model its own does not, in this Court's view, transfer MCCSA's statutory power to make its own policies to MC—nor render MC responsible for establishing employee training or policies that might have prevented the harms which Singleton suffered.[6]

4. This Case

Singleton has not established nor pled facts to show that MC, nor any MC employee, contributed to the specific conduct at issue in this case. Singleton largely pled MC and MCCSA collectively as "the Madison Defendants," but did not plead any actions particularly taken by MC or its agents. Further, the MC Director of Human Resources stated that she was not informed of Singleton's incident (despite being a point of contact on county vehicular accidents). ECF No. 19-1 (Decl. of Loretta Phillips). She has not "been involved, officially or unofficially, in any

---

[6] Even if MCCSA wanted to cede its policymaking authority to MC, it is unclear it could legally do so. The Miss. AG, reasoning that the State legislature's intent was "that the policy, plans, priorities and activities of the human resource agency be directed by a duly appointed and constituted governing board," opined that "such governing board may not delegate these responsibilities to other county officials." ECF No. 32-2 (sourced from 1989 WL 503417 (Miss.A.G.)) at 2–3.

disciplinary action considered or taken concerning MCCSA employees, including the MCCSA bus driver who was driving the MCCSA bus in the lawsuit at hand." *Id.* MC has confirmed that it has no insurance policies to satisfy a judgment against MCCSA. ECF No. 60-1 at 3; *see also* ECF No. 60-2 (MCCSA is not aware of any such policy held by MC). This fact sets this matter apart from *Brown*, in which the evidence "suggest[ed] that judgments against the sheriff or deputies are ultimately paid out of the county treasury." 927 So. 2d at 737.

### C. Municipal Liability

Singleton, in the "alternative," argues that her federal claims hold water on the basis that MC "knew or should have known that its policies or lack of policies" would lead to MCCSA drivers failing to take safety precautions[7]—and, thus, MC violated "Section 1983, the ADA and the Rehabilitation Act." ECF No. 63 at 13. Singleton contends that MC "provided two handbooks to MCCSA[,] so MCCSA could follow twelve different [MC] policies" and, that MC, therefore, "knew or [should] have known [that the] lack of a policy regarding [how MCCSA should transport] disabled citizens" would cause injuries like Singleton's. *Id.* at 13–14.

As discussed above, though, there is no evidence that MC controlled which of its policies MCCSA must follow, or otherwise oversaw MCCSA's day-to-day work. Secondly, Singleton identifies no basis from which to conclude that MC had authority—let alone a duty—to promulgate policies for MCCSA regarding its manner for "transporting disabled citizens." MC's putative failure to command MCCSA to secure riders, therefore, cannot be said to represent an official policy or custom (or omission thereof) to render MC a proper party to this suit.

---

[7] (Here, Singleton alleges that the MCCSA driver supposedly failed to secure Singleton "by a seatbelt and shoulder harness," secure Singleton's wheelchair, or "safely operat[e] the MCCSA vehicle violated Section 1983, the ADA and the Rehabilitation Act.")

## IV.     CONCLUSION

Upon consideration of the relevant law, the record, and the arguments, this Court finds that MC's inclusion as a party in this matter is improper. Singleton has not levied a claim against MC for which relief can be granted because MC is a separate entity, in law and in fact, from MCCSA. The record also stands barren of indications that MC may be directly or even indirectly responsible for the acts and omissions of MCCSA in this case. This Court finds that Singleton has failed to present genuine disputes of material fact to the contrary, despite a fair opportunity to take discovery to do so. This Court, then, must dismiss all of Singleton's claims against MC.

**IT IS ORDERED** that MC's motion for summary judgment (ECF No. 60) is **GRANTED**, that Singleton's claims against MC are **DISMISSED WITH PREJUDICE**, that MC shall be **TERMINATED** as a party, and that any stay over this matter be **LIFTED**. The parties are to contact Magistrate Judge LaKeysha Greer Isaac regarding a new case management schedule.

**SO ORDERED AND ADJUDGED** this the  29th  day of      March      , 2025.

/s/ HENRY T. WINGATE
**UNITED STATES DISTRICT COURT JUDGE**